IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

JOHN DUNZER,                                  )
                                             )
                    Plaintiff,               )       TC-MD 130276D
                                             )
        v.                                   )
                                             )
CLATSOP COUNTY ASSESSOR,                     )
                                             )
                    Defendant.               )       **FINAL DECISION**

The court entered its Decision in the above-entitled matter on November 18, 2013. The

court did not receive a request for an award of costs and disbursements (TCR-MD 19) within 14

days after its Decision was entered. The court's Final Decision incorporates its Decision without

change.

Plaintiff appeals the 2012-13 real market value of property identified as Account 14127

(subject property). A trial was held in the Oregon Tax Courtroom, Salem, Oregon, on

Wednesday, August 14, 2013. Plaintiff, a licensed real estate broker in California, appeared on

his own behalf. Michael Grant (Grant), Assessor, appeared on behalf of Defendant.

Plaintiff's Exhibits 1 through 3 and Defendant's Exhibits A through C and rebuttal

Exhibits D through J were received without objection.

I.  STATEMENT OF FACTS

The subject property is a single family residence on a .23 acre lot located on a cul-de-sac

in "the Cove" neighborhood of Seaside, Oregon. (Ptf's Ex 1 at 7; Def's Ex A at 1.) The subject

property was built in 1994 and subsequently remodeled and improved. (Ptf's Ex 1 at 7-8; Def's

Ex A at 1.) As of the assessment date, the subject property had four bedrooms, four and one-half

/ / /

bathrooms, a finished attic, central vacuum system and an elevator, providing access to all floors. (Ptf's Ex 1 at 7-8; *see* Def's Exs A at 1, C at 1.)

Plaintiff described the subject property as consisting of "1985 sq ft. of livable area and 1625 sq.ft. of non permanently heated non-livable floor space." (Ptf's Ex 1 at 8.) Plaintiff testified about numerous deferred maintenance issues, including "rotted outside railings" and a "worn out roof." Plaintiff testified that a portion of the garage was "structurally unsound" and "needs to be reconstructed" to "meet the wind loads for [the] area and * * * to be safe." (Ptf's Ex 1 at 7, 35.) Plaintiff testified that the subject property's value was negatively impacted by being located in a tsunami inundation zone.

Plaintiff relied on an Oregon Department of Revenue publication entitled "The Sales Comparison Approach to Value" in determining the subject property's real market value. (*See* Ptf's Ex 1 at 4.) Plaintiff's sales comparison approach relied on two comparable sales located on the same cul-de-sac as the subject property. (*Id*. at 13.) Comparable #1 sold for $400,000 in October 2012. (*Id.* at 20.) Comparable #2 sold for $418,750 in April 2012. (*Id.* at 15.)

Plaintiff adjusted the sales prices of the comparable properties based on numerous criteria, including lot features, home type, construction quality, structure maintenance, building area, number of bedrooms, number of bathrooms, elevator, central vacuum, and number of garages. (*See* Ptf's Ex 1 at 29.) Plaintiff also determined that the subject property and two comparable properties "have extensive uncovered and covered decks and porches so adjustments are unnecessary" for those features. (*Id.*) To account for the subject property's deferred maintenance, Plaintiff gave each comparable property a negative $31,000 adjustment. (Ptf's Ex 1 at 35.) Plaintiff valued the subject property and the comparable properties, assigning different prices per square foot to different types of living space: $102 per square foot for heated

main floor space; $60 per square foot for heated second floor space; $50 per square foot for unheated floor space, and $30 per square foot for finished attic floor space. (*See* Ptf's Ex 1 at 37.) Using those prices per square foot, Plaintiff adjusted the comparable properties resulting in a positive $31,000 adjustment for comparable #1 and a negative $34,000 adjustment for comparable #2. (*Id.*) Plaintiff made adjustments based on the number and locations of bedrooms in the comparable properties, resulting in a negative $15,000 adjustment for comparable #1 and a negative $10,000 adjustment for comparable #2. (*Id.* at 38.) Based on the ratio of bathrooms to bedrooms, comparable #1 was given a positive $5,000 adjustment and comparable #2 was considered similar to the subject property with no adjustment being made. (*Id.*) Both comparable properties were given positive adjustments of $24,000 for their lack of an elevator and central vacuum system. (*Id.*) Comparable #1 was given a negative $12,000 adjustment based on its larger, detached garage, while comparable #2 was given no adjustment for its smaller detached garage, which Plaintiff determined was similar to the subject property. (*Id.*) Plaintiff applied a small time adjustment to each comparable property. (*Id.* at 40.) Plaintiff made negative adjustments to the comparable properties based on the lack of the subject property's ocean view. (*Id.*) Plaintiff gave Comparable #2 a positive $75,000 adjustment because it is a townhouse with a shared wall as opposed to a detached single family residence. (*Id.* at 41.) Plaintiff determined adjusted sale prices of $413,000 for comparable #1 and $422,000 for comparable #2, with a reconciled real market value of $420,000 for the subject property. (*Id.* at 40-41.)

Grant considered the cost approach, market approach and income approach, "but the income approach was not utilized as the subject property was not leased and there is limited useful income and expense data for an owner occupied single family residence." (Def's Ex A

at 12.) Grant stated that "The Market Approach and elements of the Cost approach were used to determine RMV [real market value]," and that the "cost approach was considered and stated, but not relied upon individually." (Def's Ex A at 2.) Grant determined the subject property's value under the cost approach to be $609,557. (*Id.* at 13.)

Grant provided two sets of comparable properties. (*See id.* at 4, 8-9.) Grant's first set of comparable properties included "two comparable sales approximately 2 – 3 blocks South of the subject [property] * * *." (*Id.* at 13.) Grant's comparable properties sold in 2011; comparable #1 sold for $345,000 and comparable #2 sold for $337,880. (*Id.* at 3.) Grant adjusted both sales for time, class, condition, size, garage, number of bathrooms, fireplace, heating and cooling, elevator, and vacuum system. (*Id.* at 4.) Grant determined adjusted sale prices of $567,322 and $582, 503 for the two comparable properties. (*Id.*) Grant determined a real market value for the subject property of $588,449.[1] (*Id.*)

Grant submitted a second sales comparison analysis, using Plaintiff's comparable properties. (*Id.* at 8.) Grant stated that he used "the inverse of the 2013 ratio trends to bring the sales prices to the estimate price the property would have sold for as of the assessment date." (*Id.* at 14.) Grant also determined that "[f]or the 2012 year * * * there was no time trend for improved properties." (*Id.*) Grant made adjustments for "condition, size and other features such as the elevator, vacuum systems, covered porch etc." (*Id.*) Grant testified that "[b]oth of these sales are similar in age and class, but are inferior in terms of sq. ft. and other improvements." (*Id.*) Grant determined adjusted sales prices of $554,217 and $594,445 for Plaintiff's comparable properties. Grant's adjusted real market values "bracket the subject [property's real

---

[1] The stated real market value appears to be a typographical error. The subject property's real market value determined by the board of property tax appeals was $580,449, and Grant concluded that the subject property's real market value using the sales comparison approach was $580,449. (Ptf's Compl at 2; Def's Ex A at 14.)

market] value of $580,449 as of January 1, 2012." (*Id.*) Grant also presented evidence of the listing history of the subject property in support of his real market value determination.

Plaintiff's requested subject property real market value is $420,000. (Ptf's Compl at 1.) Grant's requested subject property real market value is the 2012-13 tax roll value of $580,449. (Def's Ex A at 14.)

## II.  ANALYSIS

The issue before the court is the subject property's real market value as January 1, 2012. ORS 308.007; ORS 308.210. [2]  In Oregon, all real property "not exempt from ad valorem property taxation or subject to special assessment shall be valued at 100 percent of its real market value."  ORS 308.232.  Real market value is defined as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."  ORS 308.205(1).  "Real market value * * * shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 305.205(2).

As the party seeking affirmative relief, Plaintiff bears the burden of proving that the subject property's real market value is incorrect on the tax roll.  ORS 305.427.  Plaintiff must establish his claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence."  *Schaefer v. Dept. of Rev.*, TC No 4530, WL 914208 *2 (July 12, 2001) (citing *Feves v. Dept. of Revenue*, 4 OTR 302 (1971)).  This court has stated that "it is not enough for a taxpayer to criticize a county's position.  Taxpayers must provide competent evidence of the [real market value] of their property."  *Poddar v. Dept of Rev.*, 18 OTR 324, 332

---

[2] The court's references to the Oregon Revised Statutes (ORS) and the Oregon Administrative rules (OAR) are to 2011.

(2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002) (citation omitted)). "Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD No 110300D at 7 (Mar 13, 2012). Evidence that is inconclusive or unpersuasive is insufficient to sustain the burden of proof. *Reed v. Dept. of Rev.* (*Reed*), 310 Or 260, 265, 798 P2d 235 (1990).

There are three approaches to valuation (income, cost, and sales comparison) that must be considered when determining the real market value of a property. *Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003); *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995); *see also* OAR 150-308.205-(A)(2)(a). All three approaches must be considered, although all three approaches may not be applicable to the valuation of the subject property. OAR 150-308.205-(A)(2)(a). The valuation approach to be used is a question of fact to be determined on the record. *Pacific Power & Light Co. v. Dept. of Revenue*, 286 Or 529, 533, 596 P2d 912 (1979).

Plaintiff relies on the sales comparison approach; Defendant relies on the sales comparison and the cost approach. Grant stated that "[t]he income approach was considered but not used as [the subject property] is not income producing * * *." (Def's Ex A at 2.) "The cost approach is particularly useful in estimating the real market value of new construction because cost and market value can be more closely related when properties are new." *Anderson v. Lane County Assessor*, TC-MD 090298 at 6 (Nov 17, 2009). The subject property was built in 1994; several renovations and additions were completed. The assessment date is more than 18 years after initial construction was completed. (*See* Ptf's Ex 1 at 7-8; Def's Ex A at 4.) Even though it has been renovated and remodeled, the subject property is not new construction. Because the

subject property is not new construction and is not income producing, the most appropriate method to value the subject property is the sales comparison approach.

Plaintiff's sales comparison approach was based on two comparable properties located on the same cul-de-sac as the subject property. (*See* Ptf's Ex 1 at 30.) Plaintiff prepared the sales comparison approach himself. His testimony was credible. Plaintiff's analysis stated significant adjustments for total living space, lot features, home type, construction quality, structure maintenance, number of bedrooms, number of bathrooms, elevator, central vacuum system, garage, and view. (*Id.* at 29.) Some of those adjustments, total living area, home type and garage, were taken from an appraisal report prepared years prior by an appraiser. (*See id.* at 25.) Plaintiff made a large adjustment for home type, relying on the work of another appraiser. (*See id.*) The appraisers who prepared the reports and determined the adjustment amounts were not present at trial and did not testify. Without the supporting testimony of the appraisers who prepared the reports and determined the adjustments, the adjustments are not verified. Defendant and the court were deprived of an opportunity to question the appraisers. Plaintiff testified that he did not independently measure the total area of the subject property, nor did he provide any independent basis for the need or the value for many of the adjustments he made. Many of Plaintiff's adjustments are based on three different prices per square foot values. None of those values were verified and those adjustments were made without verifying the subject property's total living space.

Plaintiff submitted a document to support his adjustment for the elevator. (Ptf's Ex 2 at 6-8.) The document stated a total bid amount of $30,219 with a "cash discount to meet competitor" of $7,500. (*Id.* at 7.) There is no indication that the stated amount was the amount paid to install the elevator or that it was the total cost to install the elevator. The document states

that it "does not include any construction of the required hoistway." (*Id.* at 8.) Plaintiff offered no evidence to show that, even if the document correctly states the amount spent to install the elevator, the subject property's real market value was increased by that amount. A residential elevator is not a common single family residence improvement, and the evidence does not necessarily support Plaintiff's estimated real market value.

Plaintiff provided additional evidence in support of his assertion that the subject property real market value is negatively impacted by deferred maintenance. Plaintiff submitted pictures of the subject property's roof and porch railings. (Ptf's Ex 2 at 14, 16.) Plaintiff testified that the pictures were taken about a year after the assessment date but reflect the subject property's condition as of the assessment date. Those pictures and Plaintiff's testimony are persuasive evidence that deferred maintenance issues exist. However, Plaintiff did not provide any persuasive evidence regarding the cost of the maintenance. Plaintiff's cost estimates were based on his determined general estimates taken from vendors' websites. (*See generally* Ptf's Ex 2.) None of the estimates were verified by licensed contractors. Plaintiff's cost estimate to rebuild a portion of the garage is not dated or signed and does not clearly state who or what company prepared it. (*Id.* at 17.) Without some explanation of where the costs associated with the repairs came from, it is not possible to properly weigh the credibility of the evidence. Without credible evidence, the court cannot make a determination as to the cost to cure the identified deferred maintenance issues. The court gives no weight to Plaintiff's cost estimate evidence for any of the deferred maintenance issues, or for the improvements to the home.

Plaintiff considered two other adjustments, one for being located in a tsunami zone and one for the purported lack of ocean views from the subject property. (Ptf's Ex 1 at 40.) Plaintiff testified that the house is in a tsunami inundation area, but describes the comparable properties as

"similar" and made no adjustment for it. (*Id*.) Plaintiff did not present any evidence that an additional adjustment was required because the subject property is located in a tsunami zone. Plaintiff did not support his assertion that a separate adjustment would be required for the subject property or proof that the tsunami inundation issue was not already reflected in his comparable properties' real market values. Plaintiff's adjustments for views suffer from the same lack of substantiation as other proposed adjustments. From the few pictures Plaintiff included in his evidence, it is impossible to determine what the view is from the subject property or any of the comparable properties. Plaintiff's supporting evidence for the subject property's view adjustments were studies done in different markets in different states (not Oregon) without any explanation of how those studies relate to the subject property's location and view. (*See* Ptf's Ex 2 at 2.) The court gives no consideration to Plaintiff's view adjustments and tsunami evidence.

In the absence of supporting evidence and the appraisers' testimony, the court cannot place much, if any, weight on Plaintiff's comparable sales approach. The court finds that Plaintiff did not meet his burden of proof to support his requested subject property's real market value. Even though Plaintiff failed to carry his burden of proof and "the burden of going forward with the evidence" has not shifted, the court "has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.427; ORS 305.412. The court will now examine Defendant's evidence.

Grant stated that "elements of the Cost approach were used to determine RMV," and that the "cost approach was considered and stated, but not relied upon individually." (Def's Ex A at 2.) Grant provided a summary of the cost approach stating that the "estimate of value based on the cost approach *would* be as follows[.]" (*Id.* at 13.) (Emphasis added.) Grant's word choice

implies that he did not complete the cost approach analysis and he did not include a full cost approach analysis. Grant provided a ratio study to support his stated land value but provided no information on how the improvement value was determined. Without a fully developed cost approach, the court cannot determine the validity of Grant's determination. The court gives Defendant's cost approach no consideration.

Grant relied on the sales comparison approach, using two different sets of comparable properties. For his first comparison, Grant used two comparable properties that were located "approximately 2 – 3 blocks South of the subject [property]." (Def's Ex A at 13.) He determined that, after appropriate adjustments, the comparable properties "were similar to the subject property value of $588,449, but in both cases the comparable properties were of lower class and quality and not as comparable." (*Id.*) Based on Grant's statements that the comparable properties chosen are not comparable to the subject property, the court gives his first sales comparison approach little consideration.

Grant's second sales comparison approach relied on the same comparable properties as Plaintiff. Grant stated that he adjusted the two sales "by the inverse of the 2013 ratio trends to bring the sales prices to the estimate price the property would have sold for as of the assessment date." (*Id.* at 14.) He stated that he used "ratios * * * that have been identified in the 2013 Ratio Study currently under review with the [Department] of Revenue." (*Id.*) Grant also determined that "[f]or the 2012 year * * * there was no time trend for improved properties." (*Id.*) Grant then applied adjustments for "condition, size and other features such as the elevator, vacuum systems, covered porch etc." (*Id.*) After making the adjustments, Grant determined that the comparable properties were "similar in age and class, but [were] inferior in terms of sq.ft. and other improvements. After adjustments they are the most comparable * * *." (*Id.*)

The court agrees that the comparable properties chosen by Plaintiff are the most comparable to the subject property. The choice to trend the subject property's real market value through the use of a 2013 ratio study that is not in evidence makes it difficult for the court to determine the validity of the analysis. Grant did not submit the ratio study as evidence. From Grant's statements it appears as though the ratio study has not yet been approved by the Department of Revenue. The court lacks any evidence from which to make an independent determination about its validity. Grant's analysis relying on the sale prices adjusted by the ratio study that may not be approved can be given little consideration. Grant's second sales analysis is also given little weight.

Although neither Plaintiff nor Defendant was able to support their requested roll value, the burden falls on Plaintiff. Although this court has the authority to make an independent determination of value, it must do so based on the evidence before it. Ultimately, there is little, if any, evidence before the court from which to make an independent determination of the real market value of the subject property. Without the evidence, the court cannot make an independent determination.

## III. CONCLUSION

After careful review of the evidence and testimony, the court finds that Plaintiff failed to carry his burden of proof and the court lacks sufficient evidence from which to make an independent determination of the real market value of the subject property. Now, therefore,

/ / /

/ / /

/ / /

/ / /

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this ___ day of December 2013.


_____
JILL A. TANNER
PRESIDING MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed.*

*This document was signed by Presiding Magistrate Jill A. Tanner on December 5, 2013. The Court filed and entered this document on December 5, 2013.*